CITY OF MORTON, Moorhead Construction Co., Inc., Owen Ayres & Associates, Inc., Petitioners,

v.

MINNESOTA POLLUTION CONTROL AGENCY, et al., Respondents.

No. C2–88–2124.

Court of Appeals of Minnesota.

April 4, 1989.

Ronald D. Olson, Carlson, Greiner & Law, Edina, for City of Morton.

Robert J. Huber, Fabyanske, Svoboda, Westra & Davis, St. Paul, for Moorhead Const. Co., Inc.

Thomas L. Adams, William M. Hart, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, for Owen Ayres & Associates, Inc.

Hubert H. Humphrey, III, Atty. Gen., Beverly Conerton, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Pollution Control Agency.

Heard, considered and decided by SHORT, P.J., and NIERENGARTEN and NORTON, JJ.

## OPINION

NIERENGARTEN, Judge.

The Minnesota Pollution Control Agency (MPCA) proposed amendments to agency rules governing the award of federal and state grant funds to municipalities for construction of publicly owned wastewater treatment facilities. The rulemaking proceedings were completed and the revisions were adopted. Petitioners challenge a portion of Minn.R. 7075.0420, subpt. 2 in a pre-enforcement declaratory judgment action under Minn.Stat. § 14.44 (1988). We affirm.

## FACTS

### Introduction

Municipalities may apply to the MPCA for financial assistance to pay for a portion of the cost of constructing a wastewater treatment facility. The MPCA has both federal and state monies available. This action concerns an amendment to rules adopted by the MPCA regarding grant amendments for increased construction costs resulting from differing site conditions. A differing site condition may generally be described as a subsurface or other unknown physical condition at the site which differs materially from that indicated in the contract or from that which is ordinarily encountered, which leads to a material change in the cost of construction. Under the challenged rule, Minn.R. 7075.-0420, subpt. 2, grant amendments for unanticipated site conditions are limited to two percent of the as-bid costs. In a pre-enforcement declaratory judgment action, petitioners challenge the validity of that portion of the rule, the current version of which is found in Minn.R. 7075.0420, subpt. 2 (1987).

### Federal Law and Regulations

The federal construction grant program is authorized by 33 U.S.C.A. §§ 1281–99 (West 1986 & Supp.1988). Congress delegated authority for administration of the grant program to the Environmental Protection Agency (EPA). 33 U.S.C.A. § 1251(d) (West 1986). The EPA in turn delegated much of the implementation of the program to the states. 33 U.S.C.A. § 1296; 40 C.F.R. §§ 35.912, .936–21, .3000–.3035 (1988).

The program currently provides for a federal grant of 55 percent of the eligible costs of constructing or upgrading wastewater treatment facilities to municipalities. 33 U.S.C.A. § 1282(a)(1) (West Supp.1988). If a municipality proposes to construct a facility using innovative or alternative technology, it can receive a federal grant of up to 85 percent of certain eligible costs. 33 U.S.C.A. § 1282(a)(2) (West 1986).

Grant funds are allotted among the states by the EPA according to a formula specified by Congress. 33 U.S.C.A. § 1285 (West 1986 & Supp.1988). Each state is generally required to develop a project priority list based upon specified criteria. 33 U.S.C.A. § 1296 (West 1986); 40 C.F.R. § 35.915.

The federal regulations establish minimum requirements for state and local procurement systems. 40 C.F.R. § 35.936–.939. They include provisions applicable to construction contracts of the grantee municipalities. *Id.* §§ 35.938 to .938–9 & app. C–2. Each construction contract between the municipality and contractor must include certain contract provisions, including a clause allowing the contractor an equitable contract price adjustment for unforeseen site conditions. 40 C.F.R. § 35.938–8 & app. C–2(3)(a).

### State Law and Rules

The EPA delegated authority to the MPCA to manage the grant program. The legislature authorized the MPCA to receive and disburse such federal funds. Minn. Stat. § 116.03, subd. 3 (1988). The MPCA was authorized to promulgate rules for the administration of the federal grant program. Minn.Stat. § 116.16, subd. 5.

The MPCA adopted rules accordingly. The version of the challenged rule prior to the amendments was as follows:

In the case of a project for which the applicant has solicited and received contracts which exceed the costs estimated in the application, the director may, after consideration of available federal funds

and in accordance with EPA regulations, recommend a grant increase. A reasonable amount shall be reserved by the agency from each allotment of funds for such increases.

6 Minn.Code Agency R. § 4.8034.E.9.b(2) (1982).

On May 9, 1983, the MPCA published notice of hearing for the purpose of revising the rules. 7 Minn.St.Reg. 1595 (1983). The proposed changes included the following new rule which provided in relevant part:

1. The agency shall reserve a reasonable amount of its allotment to pay for grant increases that become necessary during the fiscal year.

2. The agency may approve a grant increase when a municipality has solicited contracts that exceed the cost estimated in the application. The agency shall approve the grant amendment if funds are available and the cost overruns are eligible and reasonable.

*Id.* at 1617.

In the accompanying statement of need and reasonableness, the MPCA first noted that the section replaced section E.9.b(2) of the existing rule with more specific language but was consistent with the agency's past practice in handling grant amendments. It explained:

It is inevitable that every fiscal year some projects will experience legitimate cost overruns and necessary changes in design. The Agency believes that it is preferable to increase the grant award in these cases than to jeopardize the entire project.

The amount the Agency will reserve for grant increases will be determined each year. The Agency has in the past attempted to reserve enough so that all legitimate grant increases can be awarded without the necessity to bump somebody off the Project List. In the past the Agency's experience has been that about 5% of the state's allotment is required to pay for grant amendments. It is likely that the Agency will continue to reserve about this percentage of its allotment each year.

On the first day of the hearing, the MPCA submitted the following amendment in Exhibit 41 to replace the previously proposed amendment to the grant amendment rule:

The agency may approve a grant increase when a municipality has solicited contracts that exceed the cost estimated in the application. The agency shall approve the grant amendment if funds are available and the cost overruns are eligible and reasonable. *Only cost overruns caused by unanticipated site conditions shall be eligible for funding through grant amendments, and the grant amendment shall be limited to 2% of the as-bid costs.*

(Emphasis by MPCA.) The agency wished to provide more specificity on which cost overruns were eligible for funding, and place a restriction on the amount of increase available. The rationale for this two percent limitation was "to prevent numerous and substantial cost increases from taking money away from other municipalities destined for a grant." It stated that once a municipality obtains a grant, it must be responsible to a large extent for any overruns that occur. It reasoned that the two percent figure was a reasonable limitation because the original grant included a three percent contingency for cost overruns, for a total cushion of five percent.

On the first day of the hearings, the attorney for the MPCA solicited comments on the amendments and made copies of the amendments available.

During the 20–day post-hearing comment period, the Agency staff submitted the following further proposed modifications:

The agency may approve a grant increase when a municipality has solicited contracts that exceed the cost estimated in the application. The agency shall approve the grant amendment if funds are available and the costs ~~overruns~~ are eligible and reasonable. <u>After the grant has been amended to reflect the as-bid costs,</u> only cost overruns caused by unanticipated site conditions shall be eligible for funding through grant amendments, and

the grant amendment shall be limited to 2% of the as-bid costs.

(Strike outs and underlined portions indicate additional proposed changes.) The MPCA explained:

The Agency wants to avoid having to consider numerous and substantial grant amendment requests after bids have been received that may result in money being taken away from one municipality to pay for cost overruns at another. Some grant amendments in the past have had this result. Therefore, it is reasonable to put a limit on the cost overruns incurred during construction that will be funded by grant amendments. Restriction of such grant amendments to cost overruns that are caused by unanticipated site conditions is fair and reasonable, and limiting the amount of the grant amendment to 2% of the as-bid cost is equitable, certain, and reasonable.

On August 2, 1983, the Hearing Examiner issued her report. She noted that the proposed section is the same as the existing rule, except that it is more specific. She stated that Exhibit 41, which was a handout available throughout the hearing, contained the proposed amendment and a discussion of its need and reasonableness. She found there was no public comment orally or in writing as to this change.

The Examiner finds that the adoption of the proposed amendment is a reasonable restriction and is consistent with the purpose of the rules and the enabling legislation. The Examiner also finds that the addition of the proposed amendment does not result in a rule fundamentally different than that contained in the rule as published in the State Register. The rule as originally proposed notified the public that the Agency was reaffirming its authority to approve grant amendments if funds were available. All the proposed amendment is attempting to do is specify some limits on the availability of grant amendments. The rule as originally published sufficiently notified all those who would be affected by the proposed amendment. The Examiner finds that the proposed rule with the above changes is needed and reasonable.

The Chief Hearing Examiner approved the report on August 30, 1983. The rules were approved as to legality by the attorney general's office on August 31, 1983. The adopted rules were published in the State Register on October 17, 1983. 8 Minn.St.Reg. 694, 697. They became effective five days later. The rules were recodified as Minn.R. 7075.0420. Minor changes have been adopted since. 10 Minn.St.Reg. 278.

Petitioners challenge that portion of the rule which imposes a two percent limitation on grant amendments in a pre-enforcement declaratory judgment action under Minn. Stat. § 14.44.

## ISSUES

1. Does Minn.R. 7075.0420, subpt. 2 exceed the MPCA's statutory authority?

2. Was Minn.R. 7075.0420, subpt. 2 adopted without compliance with statutory rulemaking procedures?

3. Does Minn.R. 7075.0420, subpt. 2 violate constitutional provisions?

## ANALYSIS

*Scope of Review*

Petitioners commenced this pre-enforcement declaratory judgment action pursuant to Minn.Stat. § 14.44 (1988). The claim falls within this court's original jurisdiction. *Ellingson & Associates, Inc. v. Keefe,* 410 N.W.2d 857, 861 (Minn.Ct.App. 1987).

The scope of review is set out in Minn. Stat. § 14.45 (1988):

In proceedings under section 14.44, the court shall declare the rule invalid if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency or was adopted without compliance with statutory rule-making procedures.

*Christian Nursing Center v. Department of Human Services,* 419 N.W.2d 86, 90 (Minn.Ct.App.1988).

■ The scope of review in a pre-enforcement challenge to a rule is more re-

strictive than review of an agency's decision in a contested enforcement proceeding. *Manufactured Housing Institute v. Pettersen,* 347 N.W.2d 238, 241 (Minn.1984). The court's review is limited to the record during rulemaking. *Id.* The court will defer to the agency's expertise and will not substitute its judgment for that of the agency. *Id.* at 244.

## I.

Petitioners first contend that the MPCA exceeded its statutory authority by imposing the two percent limit on grant amendments for differing site conditions. An administrative agency exceeds its statutory authority when it promulgates a rule which is inconsistent with the agency's enabling legislation. *Guerrero v. Wagner,* 310 Minn. 351, 357, 246 N.W.2d 838, 841 (1976).

Petitioners argue that the two percent limitation exceeds MPCA's authority because it is inconsistent with the EPA's policy of reducing the overall cost of grant-funded projects. They explain that contractors have traditionally added "contingency amounts" to their bids as insurance against the cost of potential differing site conditions. As a result, the bids did not reflect actual projected costs. Requiring the differing site conditions clause eradicates contingency pricing and therefore decreases the overall cost. *See Zontelli & Sons, Inc. v. City of Nashwauk,* 373 N.W. 2d 744, 753 (Minn.1985). Petitioners contend that the two percent cap will require contractors to return to the prior practice of contingency bidding, thus increasing costs.

The amendment precludes the municipality from seeking a grant amendment to cover more than two percent of any increase due to differing site conditions; the differing site conditions clause is still required in the contract between a municipality and contractor. 40 C.F.R. § 35.938–8 & app. C–2(3)(a). The federal laws and regulations do not require a state to provide full funding for a grant increase based upon differing site conditions.

Petitioners next argue that the two percent limitation exceeds the MPCA's statutory authority because it is inconsistent with the EPA project priority policy. The EPA regulations require participating states to formulate priority lists to determine which projects are funded, based upon specified criteria. 40 C.F.R. § 35.915. Petitioners assert that the regulations are designed to accomplish completion of projects in those municipalities which have the greatest need to address water quality problems.

Petitioners argue that if a contract does not contain a differing site condition clause, a contractor is entitled to abandon the project upon discovery of differing site conditions. They contend that many municipalities do not have the tax base to pay for significant cost overruns, and contractors could abandon the project unless the municipality assures the contractor it has sufficient resources to compensate the contractor for differing site conditions. Thus, they argue, the amendment minimizes the likelihood that priority projects will be completed.

Again we note that the contract between the municipality and contractor is required to contain the differing site conditions clause. 40 C.F.R. § 35.938–8 & app. C–2(3)(a). Further, as respondent argues, the priority system is unrelated to grant amendments. The state has sole authority to determine the priority to be given categories of projects within the state and how best to achieve federal Clean Water Act goals. 33 U.S.C.A. § 1296 (West 1986). Minnesota has adopted a priority system. Minn.R. 7075.0402–.0408 (1987).

Federal regulations allow a state to determine who obtains grant amendment increases. 40 C.F.R. § 35.955. The state may properly determine that it wishes to fund a greater number of projects and fewer grant increases. The assertion that this will lead to completion of fewer projects is speculative.

Finally, petitioners argue that the rule is invalid because it is in a substantially different form than the published proposed rule. The Administrative Procedure

Act allows modification of a proposed rule, but it "may not modify a proposed rule so that it is substantially different from the proposed rule in the notice of intent to adopt rules." Minn.Stat. § 14.05, subd. 2 (1988). "The proposed rule may be modified if the modifications are supported by the data and views submitted to the agency and do not result in a substantial change." Minn.Stat. § 14.24 (1988).

The hearing examiner's office adopted rules for determining whether a proposed rule had been substantially changed in the rulemaking process. The rules in effect at the time of the hearing, found at 9 Minn. Code Agency R. § 2.111 (1982), provided:

> In determining whether the proposed final rule is substantially different, the Hearing Examiner shall consider the degree to which it:
>
> A. Affects classes of persons not represented at the previous hearing; or
>
> B. Goes to a new subject matter of significant substantive effect; or
>
> C. Makes a major substantive change that was not raised by the original Notice of Hearing in such a way as to invite reaction at the hearing; or
>
> D. Results in a rule fundamentally different from that contained in the Notice of Hearing.

This rule has subsequently been modified and recodified. Minn.R. 1400.1100, subpt. 2 (1987).

The hearing examiner and the attorney general's office determined that the revision did not result in a substantial change. The hearing examiner specifically addressed this issue:

> The Examiner also finds that the addition of the proposed amendment does not result in a rule fundamentally different than that contained in the rule as published in the State Register. The rule as originally proposed notified the public that the Agency was reaffirming its authority to approve grant amendments if funds were available. All the proposed amendment is attempting to do is specify some limits on the availability of grant amendments. The rule as originally published sufficiently notified all those who

would be affected by the proposed amendment. The Examiner finds that the proposed rule with the above changes is needed and reasonable.

Petitioners contend substantial and profound differences exist between the proposed and adopted rule. The proposed rule did not regulate site contingencies. The adopted rule covers site contingencies and eliminates eligibility for grant increases required by any contingency other than a differing site condition. Also, the proposed rule provided no limitation on grant amendments other than availability of funds, eligibility, and reasonableness. The amended rule provides a fundamentally different criterion, the two percent limitation. The effect is to eliminate meaningful funding for differing site conditions.

Respondent argues that there was no substantial change. First, it asserts that the amended rule did not affect classes of persons not represented at the hearing. The class affected by the change consisted of municipalities eligible to receive funding to assist in the construction of wastewater treatment facilities. Notice of the hearing was sent to all counties and municipalities in the state. Respondent asserts that neither the amended nor the proposed rule affects the contractor because the required differing site conditions clause in the contract between a municipality and a contractor provides that the municipality pay for the differing site conditions. In contrast, the MPCA grant amendment rule applies only to municipalities and addresses the extent to which a municipality will be reimbursed by grant amendment for differing site conditions.

Next, respondent argues that the rule did not raise new subject matter, because the subject of both the proposed rule and adopted rule was grant amendments. Since the proposed rule conditioned a grant amendment on the availability of funds, there was no guarantee the city would receive a grant increase for a differing site condition; the adopted rule defined more precisely the amount and conditions on the availability of the grant amendment. The effect was to bring some certainty to the

**748**

agency as to how much to set aside each year for grants on differing site conditions. Respondent further asserts that the original proposed rule covered all types of grant amendments. It asserts that since there was no assurance even in the proposed rule that a city would receive all or even part of a grant increase, further specification of the money available for grant increases was consistent with the spirit of the proposed rule and did not fundamentally change it. Finally, the rulemaking procedure contemplates modification of proposed rules. *Minnesota Association of Homes for the Aging v. Department of Human Services,* 385 N.W.2d 65, 68 (Minn.Ct.App. 1986), *pet. for rev. denied* (Minn. June 13, 1986). For the reasons set out above, we agree that the revision did not constitute a substantial change.

## II.

Petitioners next assert that the rule was adopted without compliance with statutory rulemaking procedures. Minn.Stat. § 14.14, subd. 2 provides that "the agency shall make an affirmative presentation of facts establishing the need for and reasonableness of the proposed rule" at the public hearing. Petitioners assert that there is no mention of Exhibit 41 in the record of the St. Cloud or Rochester hearings. They assert error because the "after the fact" reference to the exhibit cannot be characterized as an "affirmative presentation of fact." They contend that the two percent rule was not published.

The agency explained its proposal to limit the amount of grant increases which a municipality may obtain in Exhibit 41. The hearing examiner specifically found that Exhibit 41 was available as a handout throughout the hearing. The fact that the proposal was in a written document is permissible. *See* G. Beck, L. Bakken, & T. Muck, *Minnesota Administrative Procedure* § 23.1 (1987); Minn.R. 1400.0500, subpt. 2. The agency complied with necessary procedures.

## III.

Finally, petitioners assert that the rule violates constitutional provisions be-

cause the two percent cap is arbitrary and capricious, relying upon *Pettersen.* Petitioners argue there is no indication as to the criteria used to determine that level. We disagree.

The public purpose for the rule is to conserve scarce fiscal resources and to allocate limited grant resources in a manner which will achieve the greatest benefit to the greatest number of citizens. The MPCA is in the best position to determine how these limited resources should be allocated. The agency determined that the two percent grant amendment and the three percent contingency included in the original grant for cost overruns provided a total five percent cushion, and that the municipality should be responsible for any further overrun. The court will defer to the agency's expertise in determining how best to allocate grant resources to achieve optimum pollution control results, and will not substitute its judgment for that of the agency in a pre-enforcement or facial challenge. *Pettersen,* 347 N.W.2d at 246. Further, local governments have always been expected to pay a share of the construction costs. Minn.Stat. § 116.16, subd. 4(4) (1988); 33 U.S.C.A. § 1284(a)(4) (West 1986).

Finally, we note the legislature established by statute the same two percent restriction on grant amendments for unforeseen site conditions under the state independent grants program as the agency promulgated by rule. *See* Minn.Stat. § 116.16, subd. 2(8) (1988).

## DECISION

Minn.R. 7075.0420, subpt. 2 is valid and constitutional and was properly promulgated.

Affirmed.